BARRON, Circuit Judge, dissenting. There is no question that New Hampshire law confers absolute immunity on those who appear as witnesses in judicial proceedings and on those who prepare reports in anticipation of such proceedings. This case requires us to decide, however, a distinct question concerning the scope of that immunity: whether it extends- to the purely investigative acts of those whom the State retains to help it decide whether to initiate the kind of judicial proceedings through which private parties may be sanctioned for their wrongdoing. In my view, it is a mistake to answer this question in the affirmative without first finding out whether the New Hampshire Supreme Court agrees. For, while Provencher v. Buzzell-Plourde Associates, 142 N.H. 848, 711 A.2d 251 (1998), construes the scope of the State’s witness immunity broadly, that case simply did not involve facts that implicated the State’s interest in promoting accountable government—and guarding against' investigative abuse by law enforcement officials—in the way that the case before us necessarily does. Thus, I would certify the question of whether witness immunity applies on the facts before us to the New Hampshire Supreme Court. I. On the surface, I can see how Provencher might be thought to require the dismissal of this suit on the.basis of witness immunity. Provencher held, after all, that, due' to the possible eminent .domain proceeding in the offing, litigation “was contemplated in good faith and' under serious consideration” when New Hampshire requested the appraisals from the appraisers that the State had retained. Id. at 256. As a result, Provencher ruled that witness immunity protected those appraisers, such that the suit against them for what their appraisals said could not go forward. Id. But Provencher did not conclude that witness immunity applied to protect the appraisers in that case simply'because the State knew that there eventually might be a judicial proceeding—namely, the eminent domain proceeding that the State might choose to commence. Instead, the New Hampshire Supreme Court provided a de-táiled explanation for why it concluded that, given the particular facts of that case, litigation was “seriously contemplated” at the time that the appraisals were prepared. See id. at 255-56. And, in doing so, Provencher described the caée in terms that suggest to me that the New Hampshire Supreme Court might view quite differently a case like this one, involving as it does a claim to witness immunity for a law enforcement official’s investigation into whether there was sufficient evidence of private wrongdoing to provide the predicate for initiating judicial proceedings at which discipline might be meted out. Specifically, in Provencher, the New Hampshire Supreme Court found a judicial proceeding to be “seriously contemplated,” such that witness immunity applied, only after first pointing to a pre-appraisal agreement between the State and the owner of the property that was the subject of the appraisals. Id. at 256. Provencher explained that this agreement “specifically stated that if the parties could not agree on a purchase price, then the State shall initiate an eminent domain proceeding to acquire the property and determine the purchase price in accordance with [the eminent domain statute].” Id. (emphasis added). In addition, the New Hampshire Supreme Court noted that the property owner conceded that the agreement specifically provided that, the State would commence eminent domain proceedings if voluntary negotiations between the parties failed. Id. And, finally, the New Hampshire Supreme Court indicated that the Eminent Domain Procedure Act made clear that the State could commence “condemnation proceedings” only after making an offer of purchase based on an appraisal. Id. These particular features of Provencher showed that, before the State sought the appraisals at issue, the State apparently had done -whatever investigation it needed to do in order to decide that it would take the property, via eminent domain, if necessary. Otherwise, the State would not have been in a position to represent in the agreement with the property owner that it would take the property if the property owner refused to sell. Accordingly, in Pro-vencher, there could be no doubt that— quite apart from what the appraisals might say—the State was “seriously contemplating” a judicial proceeding when the appraisals at issue were prepared, as the State could only effect through a judicial proceeding the taking that it had already made clear that it was willing to pursue. In this way, the facts of Provencher simply did not require the New Hampshire Supreme Court to decide whether it would extend witness immunity to a state-retained investigator who had been hired to investigate whether a private citizen had engaged in the kind of misconduct that could be sanctioned only through judicial proceedings. For, in such a case, involving a state investigation into possible private misconduct, the State could not—apart from what the investigator actually found through his investigation-r-have a sufficient basis for knowing whether it would have an interest in commencing a judicial proceeding at all. Yet, in this case, we are confronted with just the kind of claim to absolute immunity for a law enforcement investigation that was not presented in Provencher. As the plaintiff in this case points out, “[the appraiser who seeks witness immunity] was sérving as an investigator for the [New Hampshire Real Estate] Board, an administrative' arm, of the State, at the time of his subject transgressions[,]” and the Board in turn “relie[d] on the investigation to decide whether to commence a disciplinary proceeding.”[11] Accordingly, it is not clear to me that, just because Provencher ruled that the appraisals in that case were prepared in contemplation of a judicial proceeding, the New Hampshire Supreme Court woúld conclude that this appraisal was, too.[12] II. Adding to my doubts on this score is the fact that the New Hampshire Supreme Court has elsewhere stated that qualified—and not absolute—immunity is generally “sufficient to protect [State] officials in the exercise of their duties.” Belcher v. Paine, 136 N.H. 137, 612 A.2d 1318, 1323 (1992) (citing Burns v. Reed, 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)); see also N.H. Rev. Stat. Ann. § 99-D:1 (legislatively adopting qualified immunity for state agency officers, trustees, officials, and employees). In fact, the New Hampshire Supreme Court has even held that the one class of State law enforcement officials that it has identified as needing absolute immunity—namely, prosecutors—needs only a qualified immunity to protect its members in the performance of what the New Hampshire Supreme Court has described as their “purely investigative” functions. Id. at 1324-25. The New Hampshire Supreme Court has explained in this regard that a criminal case has not entered its “judicial phase” during the period in which law enforcement is merely investigating whether a crime has been committed. Id. For that reason, the New Hampshire Supreme Court has held that there is no need to provide prosecutors with the more complete protection that flows to them—as an offshoot of the absolute immunity that judicial officers enjoy in performing their judicial functions—once an investigation turns up sufficient evidence of criminal wrongdoing to provide the predicate for the criminal charges that would bring the case into its “judicial phase.” Id. In light of these aspects of New Hampshire law, it is not at all clear to me that New Hampshire would wish to give its investigating law enforcement officials an absolute rather than a qualified immunity in performing “purely investigative” duties. These law enforcement officials may well be called as witnesses in the event that their investigations turn up sufficient evidence of wrongdoing to lead the State to commence an action that would trigger what might be described as the case’s “judicial phase.” I am not convinced, however, that the New Hampshire Supreme Court would conclude that this fact alone necessarily entitles such investigators to witness immunity for even “purely investigative” actions. Otherwise, it would seem that even police officers could claim absolute immunity in performing their investigative functions, notwithstanding the New Hampshire Supreme Court’s conclusion that qualified immunity is generally “sufficient to protect [State] officials in the exercise of their duties.” Belcher, 612 A.2d at 1323 (citing Burns, 500 U.S. at 486, 111 S.Ct. 1934). Moreover, I note that a relatively recent case from Massachusetts suggests to me that it is a mistake to assume that the New Hampshire Supreme Court would treat that state’s law enforcement officials as merely a species of prospective witnesses for purposes of determining whether they are entitled to absolute (rather than merely qualified) immunity in conducting investigations into private wrongdoing. And, of course, New Hampshire has looked to Massachusetts in determining the contours of its own absolute immunity law. See McGranahan v. Dahar, 119 N.H. 758, 408 A.2d 121, 124 (1979) (citing Aborn v. Lipson, 357 Mass. 71, 256 N.E.2d 442 (1970)). The case I have in mind is Dear v. Devaney, 83 Mass.App.Ct. 285, 983 N.E.2d 240 (2013). It concerned whether, under Massachusetts’s absolute privilege for witness statements, allegedly defamatory statements made by police officers in reporting their investigation of a nightclub’s entertainment license violation were absolutely privileged. Id. at 242-45. In that ease, police officers who had been assigned to assist a state licensing board in deciding whether to suspend a nightclub’s license prepared an investigative report that contained allegedly defamatory statements. Id. at 242-43. After the police officers provided their report to the licensing board, a disc jockey who the report said was operating a promotion company that was staging events that posed a danger to public safety sued the police officers for defamation, Id. at 243. The police officers then asserted Massachusetts’s state law witness privilege—which usually is absolute—as a defense against that suit. Id. at 244. The Massachusetts Court of Appeals explained that Massachusetts’s absolute witness privilege for statements made in the course of a judicial proceeding—much like New Hampshire’s absolute witness immunity—does extend “prior to the actual commencement of the judicial part of the proceeding! ],” so long as the proceeding “is contemplated in good faith and ... is under serious consideration”. Id. at 246 (quoting Sriberg v. Raymond, 370 Mass. 105, 345 N.E.2d 882, 884 (1976)). And, in applying that Frovencher-like standard, Dear also made clear—quite in accord with the way that Provencher applies that standard—that this privilege has been extended to “pretrial materials prepared by prosecutors and other lawyers,” as well as to “witness statements made to the police,” at least when they are made “in the context of a proposed judicial proceeding.” Id. But, Dear then went on to point out that “[a]n absolute privilege has not ... been extended to police officers’ own investigatory reports.” Id And thus Dear shows that the same standard Provencher applied is one that has been quite comfortably understood not to require immunity for law enforcement’s investigatory reports. In this connection, Dear cited to cases holding that statements made by police officers in the course of investigations were only conditionally privileged. See Seelig v. Harvard Coop. Soc’y, 355 Mass. 532, 246 N.E.2d 642 (1969). Dear also relied on Buckley v. Fitzsimmons, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), which held—in accord with the way that New Hampshire law treats prosecutorial immunity as a matter of state law—that, under 42 U.S.C. § 1983, prosecutors enjoy absolute immunity only during the judicial, and not the purely investigative, phase of a criminal case. Dear, 983 N.E.2d at 246 (quoting Buckley, 509 U.S. at 273, 113 S.Ct. 2606). In laying out these principles, Dear did not “rule categorically on the privileged status of police investigatory reports in general.” Id at 246 n.7. But, Dear did note that cases in other jurisdictions “have mostly treated police reports under the rubric of a qualified privilege.” Id. (citing Marjorie A. Shields, Annotation, Immunity of Police or Other Law Enforcement Officer from Liability in Defamation Action, 100 A.L.R.5th 341, 377-82 (2002)). Dear then ruled that the statements made by police officers in the investigatory report at issue in that case were entitled to only a qualified, and not an absolute, ■ privilege under Massachusetts law. Id. at 246-47. Dear reasoned that the statements “were made during the investigation, not the prosecution, of the license suspension proceedings. They-were made by police officers, not lawyers or prosecutors. For the most part, the report does not contain witness statements but the officers’ own speculation or recounting of unidentified hearsay.” Id. at 246. The facts of Dear are by no means identical to those presented here. Dear held that “an absolute privilege does not extend to statements made by police officers so far removed from any quasi judicial proceedings 'that would test the truth or falsity of such assertions.” Id. And, unlike in our case, the party allegedly defamed by the investigative report in that case was not the party against whom the, license suspension proceeding was contemplated. See id. at 246-47. In consequence, the subject of the investigative report there, would not have had a chance—in the way that the plaintiff in the present case would—to “test the validity” of the offending statements at the contemplated licensing board proceeding. Id. at 247. Moreover, the investigators in Dear were police officers, and thus governmental employees, Here, of course, that is not the case. The investigator who sééks absolute immunity is' a private citizen whom the State has retained for this particular investigation. But, these distinctions - aside,. Dear did note that, at the time that the police officers prepared the report in that case, they were acting as investigators working for the state’s licensing board. Id. In fact, the police officers apparently undertook the investigation as agents of the state’s licensing board with an eye towards a possible suspension of the nightclub’s license. Id at 242. And, Dear noted, too, that one of the police officers testified that the information that he gathered for the report uncovered information that could have been used to bring criminal charges against the disc jockey, even though the officer chose not to do so. Id. at 247. Thus, in my view, Dear at least suggests this much: investigative reports prepared for the government in advance of either a future. licensing proceeding or a future criminal case are not necessarily entitled to an absolute privilege. Indeed, Dear represents that there is apparently little support for a contrary conclusion in the precedents of any state. In consequence, I see no reason to be certain that New Hampshire would approach the question whether absolute witness immunity extends to the investigative acts of those whom the state calls upon to help it enforce the law any differently from the way that the Massachusetts Court of Appeals did in Dear and that, apparently, most states do. And, if that is so, then Provencher can hardly be said to be controlling here. III. To be sure, the defendant in this case is not a state employee. He is a private citizen whom the State retained to assist in its investigation of a licensee’s alleged misconduct. And states often reach out to such private actors for similar invéstigative assistance in policing the professions. That feature of this case may distinguish it from others involving state law enforcement investigators—such as, perhaps, cases that look more like Dear. Nevertheless, I think it important to recall that the plaintiff in this case contends not only that he was defamed by the allegations lodged against him by the investigator whom the State retained to investigate the possible wrongdoing but also that this state-retained investigator was a direct competitor of his. He thus alleges that the investigator who seeks an absolute immunity for his investigative acts is hardly a person well positioned to perform them on behalf of the State in a disinterested manner. Those allegations—whether supported by the record or not—are a reminder of the dangers that can attend the conferral of absolute immunity on those whom the state chooses to arm with significant power to ferret out private wrongdoing, even when those investigators are not full-time employees of the state.[13] Thus, due to the well-known tendency of absolute power to corrupt absolutely, I see no reason to risk being- wrong by expansively construing the scope of New Hampshire’s witness immunity to extend beyond the facts of Provencher to encompass this case, too. Instead, I believe it appropriate for us to take the more cautious approach of certifying the question to the New Hampshire Supreme Court so that it may weigh for itself the competing interests that are at stake in a case of this special sort and then fashion a rule in response. For these reasons, I respectfully dissent. . This possible basis for distinguishing Pro-vencher also was raised—but never directly addressed—by Provencher itself. One of the two arguments that Provencher identified as having been presented by the plaintiff in that case with respect to absolute immunity was whether that, immunity applies to a report that “causes” the judicial proceeding. See 711 A.2d at 253. Provencher, however, said nothing directly about that issue—namely, whether the appraisals at issue "caused” the proceeding—in the course of ruling as it did, . T do not mean to suggest that, in Pro-vencher, the judicial proceeding was certain to happen or that the appraisals. could .not play any role in determining whether it ‘would. The appraisals might have affected the property owner's willingness to accept the State’s offer of purchase, and there would have been no need for a judicial proceeding if the property owner were willing to sell. In, addition, the State could havé learned Something from the appraisals that could have led the State to retreat from its previously expressed commitment to acquire the land by taking it if necessary, Nevertheless, nothing in the record suggests that the, State was looking to the appraisals in order to decide whether to take the coercive action that could necessitate the relevant- judicial proceeding. The State instead was using the appraisals merely to facilitate the acquisition of the property that the State had already made clear that it was willing to pursue, through a judicial proceeding if necessary. And that is presumably because the State’s own prior investigation into the property had led it to see the need for initiating a taking in the absence of a sale. For that reason, Provencher is quite unlike the present case, in which the State's interest in ever initiating a judicial proceeding is seemingly entirely dependent on the outcome of the preliminary law enforcement investigation that the appraiser who seeks witness immunity has been retained by the State to carry out. . Further, no party makes the argument that qualified immunity would not apply to a contractor like Currier, and the statute codifying official immunity in New Hampshire applies not only to employees but also to "officials” and "officers.” So, just as the parties appear to accept that the proceeding here is "judicial,” they also appear to accept that if witness immunity does riot apply, at least official 'immrinity—as opposed to no irrirnunity at all—does. - '